UNITED STATES of America, Appellee,

v.

**Jose MUNIZ, Defendant–Appellant.**

**No. 1163, Docket 94–1470.**

United States Court of Appeals, Second Circuit.

Argued March 23, 1995.

Decided June 29, 1995.

Colleen P. Cassidy, New York City (The Legal Aid Soc., Federal Defender Div. Appeals Bureau, on the brief), for defendant-appellant.

John M. McEnany, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty. S.D.N.Y., New York City, on the brief, Alexandra Rebay, Asst. U.S. Atty., New York City, of counsel), for appellee.

Before: LUMBARD, KEARSE, and LEVAL, Circuit Judges.

LEVAL, Circuit Judge:

Jose Muniz appeals his conviction after jury trial for possessing heroin with intent to distribute; he argues that the evidence was insufficient as a matter of law and that the court improperly admitted empty glassine envelopes pursuant to Rule 404(b). Muniz also appeals his sentence on a firearms charge to which he pleaded guilty, claiming that United States Sentencing Guidelines § 4B1.4, which determines the guidelines range for "armed career criminals," is invalid.

## BACKGROUND

On February 24, 1993, a United States Postal Inspection Service police officer, at the request of the New York City Housing Police, opened a bank of mail boxes in the lobby of 520 East 137th Street, Bronx, New York. The mail box to Apartment 6C was found to contain 137 glassine envelopes of heroin, each bearing a rubber-stamped brand logo: "Flatliner," "Terrific," or "Monster."

Eight days later, Housing Police officers executed a search warrant for Apartment 6C. The apartment was rented to Zaida Muniz, the defendant's mother. The officers found the defendant lying on a bed, his leg in a cast. On the night stand next to the bed was a key to the apartment. A box of empty glassine envelopes, rubber-stamped with the brand name "Sledgehammer," was found on a cabinet shelf in the bedroom. The officers also found in the bedroom a loaded nine-millimeter semi-automatic handgun and a box of nine-millimeter ammunition.

The indictment charged Muniz in Count I with possessing the handgun as a previously convicted felon, in violation of 18 U.S.C. § 922(g) and 924(e), and in Count II with possessing heroin with intent to distribute, in violation of 21 U.S.C. § 841. The district court ordered severance of the two counts and scheduled separate trials. Muniz then pleaded guilty to the gun possession charge. At trial on the heroin charge, the district court excluded the evidence of the handgun and ammunition. The empty glassine envelopes found in the apartment were received over objection. The jury found Muniz guilty. At no time did Muniz move for judgment of acquittal based on the insufficiency of the evidence. He now brings this appeal.

## DISCUSSION

*I. The sufficiency of the evidence and the admission of the glassine envelopes.*

██ Muniz contends the evidence was insufficient as a matter of law to support his conviction. We consider the question to be a close one, but we do not need to resolve it. Muniz made no motion at trial for dismissal based on insufficiency. A convicted defendant who fails to raise the issue of insufficient evidence in the trial court cannot prevail on that ground on appeal unless it was plain error for the trial court not to dismiss on its own motion. *See United States v. Kaplan,* 586 F.2d 980, 982 n. 4 (2d Cir.1978); Fed.R.Crim.P. 52(b). We do not find plain error.

██ Muniz contends the evidence showed no more than his casual one-time presence at his mother's apartment, eight days after discovery of the heroin in the mailbox, which would not support the inference that he had exercised control over the heroin in the mailbox. Upon a claim of insufficiency of evidence, we must consider the evidence in the light most favorable to the government, drawing all inferences supporting guilt that a jury could reasonably have found. *United States v. Martinez,* 54 F.3d 1040, 1042–43 (2d Cir.1995). We therefore review the evidence according to that standard.

Officers of the New York City Housing Authority testified that they had observed substantial drug dealing in the lobby area and at the front of the building at 520 East 137th Street in the Bronx, and that drug dealers in such buildings would use mailboxes to store drugs and weapons.

On February 24, 1993, the Housing Authority Police conducted a search of the mailboxes at the building and found in the box for Apartment 6C fourteen bundles of glassine envelopes, ten envelopes to a bundle (137 envelopes in all), each envelope containing a $10 quantity of heroin and each stamped with a heroin brand name of "Flat-

liner," "Terrific," or "Monster." There were no signs of tampering with the mailbox; this supported the inference that only a person possessing the key to the mailbox for Apartment 6C could have been using it to store the heroin.

A witness from the Housing Authority who worked as the housing assistant for the building testified that the tenant-of-record for Apartment 6C was Zaida Muniz and that she had two children—a daughter Esther, who had gotten married and moved out many years back, and a son Jose.

In the few days immediately following the discovery of the drugs in the mailbox, the police observed the defendant Jose, who in this period was on crutches with his leg in a cast, three times at the building. Officer Nesmith saw the defendant approximately the day after the discovery of the heroin "struggling down the walkway in front of his building, 520 East 137th Street" on crutches. Two or three days after the search, as Housing Police officer Washington observed this defendant "just standing out in front of the building."

The third occasion was on March 4, 1993, when the housing officers conducted the search of Apartment 6C. On this occasion, the officers found Jose, alone in the apartment, lying on the bed in one of the two bedrooms. An officer testified he saw no "indication that anyone other than Jose Muniz and Zaida Muniz lived there." The defendant still had a cast on his leg and moved very slowly and with difficulty, requiring crutches. Next to the defendant's bed was a stand on which the officers found a key to the front door of the apartment. On an open cabinet shelf inside the bedroom, the officers found a cardboard box, without a top, which was neatly packed with empty glassine envelopes, each stamped with the brand name "Sledgehammer." These glassine envelopes, except for the different brand name, were similar to those found in the mailbox eight days before.

In the room the officers also found the defendant's gun and ammunition. However, those were not received in evidence because the district judge sustained the defendant's objection to their receipt on grounds of prejudice.

The evidence presented to the jury strongly supported the inference that the defendant either resided in Apartment 6C or, in any event, had free access to it and used it regularly. His mother was the tenant of record and had lived there many years. The testimony of the housing assistant, as to housing records, showed that the defendant's sister had married and moved out. The frequent observation of the defendant at the building, during this period in which he had a broken leg and moved with difficulty, together with his possession of a key, suggests that he either resided in his mother's apartment or at least used it frequently. That he was alone in the apartment lying on the bed suggests he was not there merely to visit his mother. His use of the bed in one of the two bedrooms suggests that he was very much at home.

Officer Washington, who observed the defendant in the bedroom, furthermore, referred to it as "Mr. Muniz' bedroom." On appeal, the defendant protests, arguing that the officer had no basis for so describing it, other than having once seen the defendant lying on the bed in that room. This, however, is inappropriately raised for the first time on appeal. Had the defendant objected, or conducted a voir dire or cross-examination as to foundation, the court might well have stricken that designation. On the other hand, it is perfectly possible that the officer had ample basis for calling it the defendant's bedroom. It may be that the bed he was lying on had been slept in, that the defendant's clothes and personal possessions were in evidence around the room, or that the defendant referred to it as his room. As there was no challenge at trial to this designation, the jury was entitled to take the officer's testimony at face value and conclude that it was the defendant's bedroom. Finally, although no key to the mailbox was found in his possession, the jury might reasonably infer, given his apparent utilization of his mother's apartment, that he had access to the key to the mailbox.

The likelihood that the defendant used that bedroom on a regular, or frequent, basis

strengthens the connection between the defendant and the box of trademark-stamped glassine envelopes on the cabinet shelf in the room. The jury could reasonably have found that these were his glassines.

Muniz contends that the empty glassines had no relevance other than as an impermissible showing of his commission of another crime to show propensity to commit the crime charged. *See* Fed.R.Evid., Rule 404(b).[1] The defendant is mistaken.

This circuit follows the "inclusionary" approach to the admission of other-act evidence, so that "evidence of prior crimes, wrongs or acts is admissible for *any* purpose other than to show a defendant's criminal propensity." *United States v. Lasanta*, 978 F.2d 1300, 1307 (2d Cir.1992) (internal quotations omitted). Here, the court properly determined that the glassine envelopes were admissible as evidence of "the identity of the defendant and the relationship between him and the 137 glassines and the heroin in the mailbox," as well as tools of the narcotics trade. This court reviews a district court's ruling on the admissibility of evidence for abuse of discretion, or for arbitrary or irrational action. *See United States v. Valdez*, 16 F.3d 1324, 1332 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 60, 130 L.Ed.2d 18 (1994). We find no such error here.

This evidence had several proper uses. By showing the defendant's possession of tools of the drug trade, this evidence properly connected the defendant to the heroin. Part of its relevance related to the defendant's state of mind, showing *intent* to possess drugs, knowledge of the illegal substance possessed, and, as a consequence, the identity of the defendant as the person responsible for the heroin in the mailbox. Had the defendant possessed a triple-beam scale and boxes of cut, this would have been relevant to show a state of mind focussed on drug dealing; his possession of other tools of the drug trade is equally relevant. Furthermore, the fact that he possessed *empty* glassines supports the inference that he participated in packaging the drugs, and therefore tends to show his knowledge of the nature of the illegal contents of the envelopes in the mailbox.

This evidence showing intent to deal in drugs had a further relevance to the issue of identity. The defendant's possession of tools of heroin trade at the time heroin was found within his possible control increases the likelihood that it was he, rather than another person having possible access, who in fact controlled the drugs in the mailbox. If a cache of heroin were found in a place to which both A and B have access, a showing that A possessed tools of the drug trade, or that A announced an intention to sell drugs, would show that A intended to distribute drugs and would thus increase the likelihood that it was A, rather than B, who owned or controlled the drugs. The situation here was similar. The jury could find that Jose and his mother shared Apartment 6C and both had access to the mailbox where the drugs were found; Jose's possession of glassine envelopes could be considered by the jury as showing that it was Jose, rather than his mother, who controlled the drugs (*i.e.*, his "identity" as the possessor of the drugs, in the terms of Rule 404(b)).[2]

---

1. Fed.R.Evid. 404(b) provides in relevant part: Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

2. The defendant contends that evidence of intent should have been removed from the case as the result of his having conceded that issue. (A 163; 181; 221) *See United States v. Mohel*, 604 F.2d 748, 751–54 (2d Cir.1979) (discussing use of concession to remove issue of intent or knowledge from case). There are at least two answers of this contention. First, the concession related only to intent *to distribute.* The evidence, however, also tended to show intent to possess drugs; thus the concession failed to deprive the evidence of useful purpose. Second, the concession was conditional; it would come into play only once the jury had found that the defendant possessed the drugs. In this case, however, the evidence of intent to distribute had an evidentiary purpose going beyond proving the element of intent to distribute; it was also a part of the showing that the defendant possessed the drugs. Thus, the defendant's limited and conditional concession failed to make evidence of the glassines superfluous.

The defendant sought to weaken the likely inference of his control over the drugs in the mailbox by an attempt to show the existence of another user of the apartment and the mailbox. The more persons shown to share the apartment or the mailboxes, the weaker the inference that the drugs were under defendant's control. The defendant thus offered evidence that at the time of the discovery of the drugs, the mailbox also contained a letter addressed to a Wilfredo Kirkaldy. The showing of the Kirkaldy letter, however, was too inconclusive to weaken substantially the tendency of the circumstances to suggest the defendant's guilt.[3] There was no showing what address was written on the letter. There was no showing that Kirkaldy resided in that building, much less in that apartment, or that he had access to the mailbox. Especially given the fact that the mailbox was being used to hold contraband that was not being delivered through the mails, the presence in the box of a letter addressed to someone named Kirkaldy told virtually nothing about who were the users of Apartment 6C and its mailbox.

As noted above, because of the failure to object below, the defendant must show on appeal not only that the evidence was legally insufficient but that it was plain error for the court to fail to dismiss on its own motion. "[T]he error must be so plain [that] the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *United States v. Yu–Leung,* 51 F.3d 1116, 1121 (2d Cir. 1995) (internal quotation omitted). Here, if there was a deficiency it was not extreme. The evidence presented was close to legal sufficiency, even if it fell a trifle short. Any insufficiency was not so plain that the trial judge was derelict in allowing judgment to be entered on the jury's verdict.

Judge Kearse in dissent raises a serious argument that the conviction should be re-versed. The case is certainly a close one. We offer the following points in respectful rebuttal.

First, Judge Kearse concedes in her opening line the "given" that "we are required to view the evidence in the light most favorable to the government and credit all inferences the jury might reasonably have drawn from the evidence." Her analysis, however, is not always faithful to that rule. When she characterizes the evidence as showing only that Muniz "went on three occasions to the residence of his mother," that is viewing the evidence in the light *least* favorable to the government. The jury was entitled to infer far more of a connection between Muniz and the apartment—at least that he frequented it with regularity. That he visited three times is the least the jury could infer.

As to a police witness's reference to "Mr. Muniz's bedroom," Judge Kearse assumes, despite the absence of objection, that the witness had no adequate basis for that description. We cannot know whether the failure to object was oversight or clever lawyering. If, in fact, it was Jose Muniz's bedroom, his attorney may well have withheld objection in order to avoid a more persuasive and better emphasized demonstration of his dominion over that room. In any event, the jury was entitled to accept the testimony at face value. The dissenting opinion grants much less.

■ When the dissent asserts that "even a trifle short is insufficient," this applies the wrong rule of law. Because of the defendant's failure to make timely objection, nothing turns on whether the evidence meets the usual test of legal sufficiency. The test is that prescribed by Fed.R.Crim.P. 52(b), ordinarily described as "plain error." This test imposes less exacting demands on the strength of the government's evidence than the ordinary test of sufficiency. In *United States v. Olano,* —— U.S. ——, ———– ——,

---

**3.** The transcript of the trial, in fact, does not even bear out that the Kirkaldy letter was in the same mailbox as the drugs. Officer Baker of the Postal Inspection Service testified as follows:

Q. Did you find any mail *in the boxes?*
A. Yes, there was one piece of mail.
Q. Who was it addressed to?
A. Alfredo.

Q. Kirkaldy?
A. Kirkaldy, exactly.
(A 133) (emphasis added) Because the government appears to concede that a letter addressed to Wilfredo Kirkaldy was in the same box, we credit defendant with the showing, even though it is not supported by the transcript.

113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993), the Supreme Court explained that a defendant must clear three hurdles to pass that test. We recently summarized *Olano*'s requirements as follows:

> First, there must be "error," or deviation from a legal rule which has not been waived. Second, the error must be "plain," which at a minimum means "clear under current law." Third, the plain error must, as the text of Rule 52(b) indicates, "affect[ ] substantial rights," which normally requires a showing of prejudice.

*United States v. Viola*, 35 F.3d 37, 41 (2d Cir.1994) (citations omitted); *accord United States v. Yu–Leung*, 51 F.3d 1116, 1121 (2d Cir.1995). As to the "plainness" branch, "the error must be so plain [that] the trial judge and prosecutor were derelict in countenancing it." *Yu–Leung, supra*, at 1121 (internal quotation omitted).

The ultimate question requires assessment of the record as a whole. It is a matter of judgment on an issue that is not easily quantifiable. Judge Kearse finds the evidence insufficient. Her position is certainly reasonable. We respectfully disagree and find the evidence sufficient to meet the test of plain error.

We note furthermore that the government possessed substantial additional evidence that was improperly excluded from the jury's consideration. The trial judge sustained the defendant's objection to the receipt of the defendant's handgun and ammunition, which were found with him in the bedroom of the apartment.

■ As the district judge recognized, there are innumerable precedents of this court approving the admission of guns in narcotics cases as tools of the trade. *See, e.g., United States v. Roldan–Zapata*, 916 F.2d 795, 804 (2d Cir.1990) (testimony regarding seizure of narcotics records, shoe boxes, and revolver properly admitted under Rule 404(b) as tools of narcotics trade), *cert. denied*, 499 U.S. 940, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991). *See also United States v. Soto*, 959 F.2d 1181, 1187 (2d Cir.1992) ("[F]irearms are as much tools of the [narcotics] trade as are commonly recognized articles of narcotics paraphernalia.") (quoting

*United States v. Crespo*, 834 F.2d 267, 271 (2d Cir.1987)). The defendant's possession of the gun was relevant. It showed that at the time he was charged with possession of the heroin, he had equipped himself with a tool of the narcotics trade. The gun, like the glassines, logically supported the proposition that it was the defendant, rather than his mother, or some other person, who placed the heroin in the mailbox. We disagree with the trial court's conclusion that prejudice outweighed the probative value of this evidence. It should have been received.

## II. Validity of USSG § 4B1.4

■ Muniz also challenges his sentence on the firearms offense. His conviction as a prior felon in possession of a handgun, 18 U.S.C. § 922(g), subjected him to a sentence enhancement under 18 U.S.C. § 924(e), which provides for a minimum sentence of 15 years (180 months). Guidelines § 4B1.4, "Armed Career Criminal," determines the offense level and criminal history category for defendants to whom § 924(e)'s sentence enhancement applies. Muniz argues that the Sentencing Commission lacked the statutory authority to promulgate a guideline incorporating § 924(e); further, he argues that even if the Commission had such authority, § 4B1.4 is invalid because the 188–month minimum sentence under the guidelines provision exceeds the fifteen-year minimum sentence set by § 924(e).

■ These precise issues were addressed in our recent decision in *United States v. McCarthy*, 54 F.3d 51, 53–54 (2d Cir.1995) (as amended), which made clear that the Sentencing Commission had the authority to promulgate § 4B1.4. *McCarthy* also holds that the guideline range under § 4B1.4 is lawful, notwithstanding the lower statutory minimum set by § 924(e). There is no obligation on the Commission to set minimum guideline ranges that coincide with the minimum punishments prescribed by the statute for such offense. *See United States v. Lattimore*, 974 F.2d 971, 974 (8th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993). If there were, each statute that permitted a sentence of zero

imprisonment would require a minimum permissible guideline range set at zero. *See United States v. Berlier*, 948 F.2d 1093, 1094–95 (9th Cir.1991). There is obviously no such requirement.

The judgment of the district court is affirmed.

KEARSE, Circuit Judge, dissenting:

With all due respect, I must dissent. It is, of course, a given that, in considering a challenge to the sufficiency of the evidence to support a conviction, we are required to view the evidence in the light most favorable to the government and credit all inferences that the jury might reasonably have drawn from the evidence. In my view, however, much of what the majority relies on is not evidence but innuendo and speculation. And taking into account all of the material on which it relies, even the majority concedes that the evidence "fell a trifle short," *ante* at 70.

The trial evidence in this case showed that defendant Jose Muniz ("Muniz"), a 38–year-old man hobbled by a broken leg, went on three occasions to the residence of his mother, Zaida Muniz. She was not always there. On the last occasion, Muniz lay down on a bed in one of the bedrooms and put the key to the apartment on the table next to him. In that bedroom was a doorless cabinet that contained narcotics paraphernalia. The affirmance today means that on the basis of his mere presence in that room of his mother's apartment, which generally is not enough even to establish possession of items found simultaneously in the apartment, *see, e.g., United States v. Soto*, 716 F.2d 989, 991 (2d Cir.1983); *United States v. Johnson*, 513 F.2d 819, 823–24 (2d Cir.1975), the jury permissibly found Muniz guilty of possessing heroin that had been found in the locked mailbox for that apartment in the building's lobby eight days earlier.

As to the mailbox itself, the majority notes that "[t]here were no signs of tampering ...; this supported the inference that only a person possessing the key to the mailbox for Apartment 6C could have been using it to store the heroin." *Ante* at 67. I agree. But there was no evidence that Muniz had a mailbox key. None was found in his posses-

sion. And although the majority says that the jury "might reasonably infer ... that [Muniz] had access to the key to the mailbox" because he was using his mother's apartment, *ante* at 68, a housing authority policeman who testified at trial stated that when Muniz was arrested the apartment was searched thoroughly, and no mailbox key was found. The suggestion that Muniz had access to the mailbox key because he had access to the apartment, therefore, is based not on any evidence but on speculation.

To compensate for the lack of evidence that any mailbox key was found on Muniz or in the apartment (there was also no other evidence connecting Muniz with the mailbox, such as fingerprints on the heroin packages), the majority endorses the government's attempt to show that Muniz was a resident of the apartment. From that premise, the argument is that Muniz either (a) had constructive possession of a mailbox key, or (b) possessed the narcotics paraphernalia found in the cabinet in the apartment and was thus also the probable possessor of the heroin in the mailbox. The foundation for these arguments is lacking, however, for there was no real evidence that Muniz resided in his mother's apartment. There was no evidence, for example, that any of his clothing, toiletries, or other belongings were in the apartment; there was no evidence that he gave his mother's apartment as his address when pedigree information was taken from him after his arrest; there was no evidence that his fingerprints were found on the cabinet, or on the narcotics paraphernalia found in the cabinet, or indeed, on anything else in the apartment.

Instead of evidence, there is innuendo and speculation. The majority opinion, stating that there was "strong[ ]" "evidence" to support an inference that Muniz resided in his mother's apartment, refers principally to the testimony of a city housing authority assistant that Muniz's sister did not live there; to the majority's own view that Muniz's lying on a bed in the apartment suggested that he was "very much at home," a view that seems more idiomatic than evidentiary; to a police officer witness's reference to the room in which Muniz was found as Muniz's bedroom; and to testimony that the officer saw no

indication that anyone other than Muniz and his mother lived in the apartment. Each of these strikes me as seriously flawed.

For example, the majority's statement that the "testimony of the housing assistant, as to housing records, showed that the defendant's *sister* had married and moved out," *ante* at 68 (emphasis added), appears to imply that the housing assistant's testimony was evidence from which it could reasonably be inferred that Muniz had continued to live there. But that testimony dealt only with Muniz's sister, not Muniz. Having testified that the housing records listed only Zaida as the tenant of the apartment and showed two offspring, Muniz and Esther, on the "family composition sheet," the housing assistant was asked, "Do those records give any indication of where *Esther* Muniz may be[,] the *other* child that you referred to?" (Emphasis added.) Her answer was that Esther had married and moved out. The assistant was not asked, either expressly in a question specifying Muniz or implicitly in a question specifying both offspring, whether the records indicated the whereabouts of Muniz. Consequently, the assistant's testimony that Esther had moved out could not reasonably be the basis for an inference that Muniz still lived there. The prosecutor's question, asking not about Muniz but only about another person, elicited evidence only as to that other person, not as to Muniz.

Similarly, when the prosecutor asked a police witness (surprisingly without objection) whether in the search of the apartment he had "come across any indication that anyone *other than* Jose Muniz and Zaida Muniz lived there" (emphasis added), the response did not elicit information about Muniz. The witness's negative response, though perhaps sounding helpful, was not in fact testimony that the witness saw an indication that Muniz himself lived there. Any implication that there was some indication that Muniz lived there rested solely in the prosecutor's question. A question, however, is not evidence from which a jury is entitled to draw inferences, and we are not required to view the innuendo in a question as evidence to be taken in the light most favorable to the government.

The witness was not asked whether he saw any indication that Muniz lived there, and his testimony revealed no such indications. While the majority speculates that "[i]t may be," *ante* at 68, that Muniz's clothes and personal possessions were found in the apartment or that Muniz referred to the bedroom in which he was found as "his room," *id.*, the government, which of course bore the burden of proof, introduced no such evidence; and at oral argument of this appeal, the government's attorney stated that he had put on the best case he could. There was no evidence such as that hypothesized by the majority, and the jury was left to infer that Muniz lived there only on the basis that the witness referred to the room in which Muniz was found as "Mr. Muniz' bedroom." Though the majority is critical of this dissent for "assum[ing]" that the witness had no basis for referring to the room in this way (*i.e.*, for pointing out the government's failure to introduce any evidence of such a basis), in my view the majority errs in hypothesizing such a basis. When no evidence of any basis for such a characterization has been offered, I think, given the presumption of innocence to which a defendant is entitled, that the lack of evidence is noteworthy; and where, as here, the government has acknowledged that it proffered all the evidence it could muster, an "assumption" that there was *no more* is compelled.

While the majority states that the government had "additional evidence that was improperly excluded from the jury's consideration," *ante* at 71, I assume that it does not mean to suggest that evidence that might have been admitted, but was not, could properly be used in determining what inferences the jury could reasonably have drawn from the evidence that was admitted.

In my view, the evidence presented at trial fell considerably more than "a trifle short"; but even a *trifle short is insufficient.* I am unpersuaded by the majority's view that evidence that is only "close to" being sufficient, *ante* at 70, is nonetheless sufficient under plain-error analysis. I am not aware of any case in which we have found the evidence insufficient to establish guilt beyond a reasonable doubt and yet have refused to find

that error "plain" and reversible. *See generally United States v. Gjurashaj*, 706 F.2d 395, 399 n. 6 (2d Cir.1983) (rejecting government's contention that its failure to prove a necessary fact was a mere technical omission, and stating that "the prosecution's failure to adduce any evidence as to an essential element of the crime must be regarded as a 'defect[ ] affecting substantial rights,' Fed. R.Crim.P. 52(b), which the appellate court may therefore review even if the defendant did not bring it to the attention of the trial court, *id.*"); *United States v. Kaplan*, 586 F.2d 980, 982–83 & n. 4 (2d Cir.1978) (reversing conviction, on plain error analysis, for insufficiency of proof). In none of the cases invoked by the majority did the court refuse to reverse on the ground that the error was not plain; indeed, none of them even dealt with a claim that the evidence was insufficient. *See, e.g., United States v. Olano*, — U.S. ——, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (improper presence of alternate jurors during deliberations found not prejudicial); *United States v. Viola*, 35 F.3d 37 (2d Cir. 1994) (instructions held plain error under new law), *cert. denied*, — U.S. ——, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995); *United States v. Yu–Leung*, 51 F.3d 1116 (2d Cir. 1995) (erroneous admission of evidence held waived). Insufficiency of the evidence is a defect that is *sui generis,* and is hence treated differently from other types of errors in many respects. For example, though the majority explains that " '[t]he error must be so plain [that] the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it,' " *ante* at 70 (quoting *United States v. Yu–Leung*, 51 F.3d at 1121), insufficiency of the proof is a defect that the court is presumed to be able to assess without the aid of the defendant. Thus, Rule 29 provides that, after the evidence is closed on either side, if the evidence is insufficient but the defendant has made no motion for acquittal, the court "shall" enter a judgment of acquittal "of its own motion." Fed.R.Crim.P. 29(a). And though other defects such as errors in evidentiary rulings or jury instructions, in order to be properly preserved, must be called to the attention of the trial court in time to permit the court to take corrective

action, Rule 29(c) expressly permits a defendant to challenge the sufficiency of the evidence up to seven days after the jury has been dismissed, *i.e.,* after it is too late for the government to supply any additional proof.

In my view, the present case meets the standard for plain error articulated by the above cases and relied on by the majority. First, there was error: the evidence was insufficient. Second, the law was and is clear: the government's burden is to introduce evidence from which a rational juror can infer guilt beyond a reasonable doubt. Third, no right is more fundamental than the right not to be convicted on the basis of evidence that fails to meet that standard; surely a defendant convicted on the basis of evidence falling short of that standard has suffered cognizable prejudice. Finally, I find it difficult to believe that the trial court is not as able as the appellate court to recognize when the evidence has fallen a "trifle" short.

Despite his failure to move for a judgment of acquittal within seven days after the jury was dismissed, Muniz's conviction on the basis of evidence that we all recognize was insufficient should not be allowed to stand.